UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2021 JUN -8  AM 8: 38**

CLERK

UNITED STATES OF AMERICA

v.

LEROY BROWN,

Defendant.

)
)
)
)
)
)
)
)

BY_____
DEPUTY CLERK

Case No. 2:20-cr-00052

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO DISMISS AND MOTIONS TO SUPPRESS
(Docs. 87, 73, & 74)

Pending before the court is Defendant Leroy Brown's motion to dismiss the
Indictment for a violation of the Speedy Trial Act, 18 U.S.C. §§ 3161(b) and 3162(a)(1).
(Doc. 87.) Defendant also moves to suppress evidence obtained from the execution of a
GPS tracking search warrant (the "tracking warrant") and moves to suppress evidence
obtained from the execution of a search warrant at the Econo Lodge room 203 (the
"Econo Lodge search warrant").[1] (Docs. 73 & 74.) Defendant contends that execution of
both the tracking warrant and the Econo Lodge search warrant violated the Fourth
Amendment to the United States Constitution because they were not supported by
probable cause. On May 3, 2021, the court held an evidentiary hearing at which Special
Agent Colin Simons testified.

Defendant is charged in a three-count Indictment with knowingly and intentionally
distributing cocaine base on three separate days in violation of 21 U.S.C. §§ 841(a),
841(b)(1)(C).

The government is represented by Assistant United States Attorney Matthew J.
Lasher. Defendant is represented by Assistant Federal Public Defender Steven L. Barth.

---

[1] The Econo Lodge search warrant authorized a search of room 203 as well as the front desk and
office areas of the Econo Lodge for evidence relating to maintaining a drug-involved premises in
violation of 21 U.S.C. § 856 and conspiring to distribute cocaine base. Defendant does not
challenge the search of the front desk and office areas.

## I.     The Court's Findings of Fact.

### A.     Evidence in Support of Probable Cause for the Tracking Warrant.

In December 2019, the Southeastern Vermont Drug Task Force (the "SEVDTF") began investigating Defendant for trafficking cocaine base in southeastern Vermont. In January 2020, the Federal Bureau of Investigation (the "FBI") joined the investigation. A confidential informant ("CI") working with the SEVDTF, in hopes of obtaining consideration on pending criminal charges, provided information in furtherance of the joint investigation. The CI was a "registered informant of the SEVDTF who advised the SEVDTF [he] knew what heroin and cocaine base looked like, how it was packaged and the terminology associated with its use." (Doc. 77-1 at 6-7, ¶ 10.) The CI advised that he had abused illegal substances in the past. At the time, he had a felony conviction for sale of cocaine and approximately ten misdemeanor convictions for theft by deception, false pretenses, petit larceny, driving with a suspended license, and buying, receiving, or possessing stolen property.

The CI advised Detective Sean Reilly that he knew of an individual selling large amounts of cocaine base in Brattleboro, Vermont who was known to the CI as "Pops." Based on the description the CI provided to Detective Reilly, Detective Reilly showed a known photograph of Defendant to the CI without markings and asked the CI if he recognized the individual. The CI identified the person in the photograph as "Pops."

Thereafter, the CI conducted "multiple" controlled purchases of cocaine base from Defendant at the direction of law enforcement. *Id.* at 7, ¶ 12. During the week of March 8, 2020, Detective Reilly met with the CI to arrange a controlled purchase of cocaine base from Defendant. Detective Reilly searched the CI and did not locate any contraband. The CI was equipped with an electronic recording device as well as SEVDTF funds to purchase the cocaine base from Defendant. The CI stated that Defendant "was in his Room 203 at the Econo Lodge on Canal Street in Brattleboro[]" and that he spoke to Defendant "just prior to meeting with Det. Reilly to confirm [Defendant's] location and availability." *Id.* at 8, ¶ 14.

2

Later that same day, Detective Reilly transported the CI to the Econo Lodge, dropped the CI off, and Detective Sergeant Christopher Lora and Detective Andrew Todd monitored the CI through an electronic recording device. Over the device, Detective Reilly heard the CI ask a person if "he was here." *Id.* at 8, ¶ 15 (internal quotation marks omitted). It was later determined that upon his arrival at the Econo Lodge, the CI talked to Jeanette Burgess[2] near a 2019 Chevrolet Impala (the "2019 Chevrolet Impala") in the parking lot of the Econo Lodge.

Detective Reilly heard the CI making contact with a person who Detective Reilly recognized to be Defendant. The CI and Defendant spoke for several minutes and Defendant expressed concerns over recent activity in Brattleboro which Detective Reilly believed was a reference to law enforcement activity, specifically the execution of multiple narcotics-related search warrants at residences in the area.

After several minutes, the CI was observed walking to meet Detective Reilly at their predetermined meeting location. While the CI was walking toward Detective Reilly's vehicle, Detective Reilly observed Defendant driving the 2019 Chevrolet Impala out of the Price Chopper parking lot and traveling north on Canal Street in Brattleboro.

---

[2] Special Agent Simons in his affidavit in support of the Econo Lodge warrant, averred that he:

> kn[ew] [Ms.] Burgess to be associated with . . . . [James] Caro [who] pled guilty in April 2019, to conspiracy to distribute narcotics and knowingly possessing a firearm in furtherance of a drug trafficking crime. . . . During interviews in which I was present, [Mr.] Caro identified [Ms.] Burgess as his wife.

(Doc. 77-1 at 8 n.1.) Special Agent Simons further averred that:

> In addition to [Mr.] Caro, Detective Sergeant Lora knows [Ms.] Burgess to have had a prior relationship with Torren Boyd [who] was charged federally in the District of Vermont for possession with intent to distribute cocaine base and Jesse Anderson who was charged by the State of Vermont with multiple distributions of heroin. In 2017, the Honorable Judge Murtha sentenced [Mr.] Boyd to serve 60 months of incarceration. In 2013, [Mr.] Anderson was sentenced to [a split sentence of] five years to five years and a day of incarceration for the three counts of sale of heroin, four counts of heroin possession and one count each of cocaine and marijuana possession.

*Id.*

Detective Reilly could not determine whether there were other occupants in the 2019 Chevrolet Impala.

At the predetermined meeting area, the CI provided Detective Reilly with a clear plastic bag containing an off-white, hard substance consistent with cocaine base wrapped in toilet paper.

The CI was searched by Detective Reilly and no money or contraband was located. The CI provided a sworn statement which was summarized in Special Agent Simons's affidavit as follows:

- The CI conducted a controlled buy of cocaine base from [Defendant];
- Prior to meeting Det. Reilly, the CI arranged to purchase cocaine base from [Defendant];
- The CI knew [Defendant] would be at the Econo Lodge on Canal Street in Room 203;
- The CI walked towards the area of the Econo Lodge, where the CI ultimately made contact with [Ms.] Burgess;
- The CI asked [Ms.] Burgess if [Defendant] was upstairs, and she said yes;
- [Ms.] Burgess was standing next to [Defendant's] vehicle, a 2019 Chevrolet Impala with Florida registration;
- As the CI started walking toward [Defendant's] room, [Defendant] appeared in the hallway;
- [Defendant] led the CI to his room, and made the CI wait outside for several moments;
- The CI was let inside the room, where [Defendant] conducted a thorough search of the CI's person;
- The CI watched [Defendant] weigh out 14 grams of cocaine base and then went back to put [his] clothing on;
- Once the CI put [his] clothing back on, [Defendant] handed the CI the cocaine base wrapped in toilet paper;
- The CI said [Defendant] then instructed the CI to "tuck" the cocaine base, meaning tuck it in the CI's pants in order to conceal it;
- The CI tucked the cocaine base as instructed;
- The CI said [Defendant's] scale may have not been accurate, or perhaps [Defendant] shorted the CI on purpose;

4

- The CI observed approximately five (5) additional grams of cocaine base inside the room, but did not see any large amounts of currency in the room;
- The CI told Det. Reilly that [he] did not manipulate the narcotics and did not receive any additional money and/or narcotics;
- The CI told Det. Reilly that [he] did not go anywhere [he] was not instructed to go and did not do anything that [he] was not instructed to do; and
- The CI advised [he] only had physical contact with [Defendant] during this controlled purchase.

*Id.* at 9-10, ¶ 19.

After the controlled purchase, Detective Reilly reviewed the electronic recording and determined that it was consistent with the CI's sworn statement as well as with the observations of law enforcement. Because the camera was obstructed, there was no video obtained inside Defendant's hotel room. Detective Reilly tested a sample of the substance purchased from Defendant using a NARK field test kit and detected the presence of cocaine. Detective Reilly weighed the suspected cocaine base which totaled approximately 9.74 grams with packaging. Detective Reilly observed the substance to have an appearance consistent with cocaine base.

During March 2020, law enforcement conducted surveillance of the 2019 Chevrolet Impala which was observed traveling back and forth between Vermont and Massachusetts "on multiple occasions." *Id.* at 11, ¶ 22. On each occasion, the 2019 Chevrolet Impala was observed traveling northbound with trips occurring between the hours of 2:00 a.m. and 6:30 p.m. "There have been multiple instances of the [2019 Chevrolet Impala] crossing the Vermont/Massachusetts border twice in less than 24 hours." (Doc. 77-1 at 11, ¶ 22.)

In his affidavit, Special Agent Simons averred that:

I know from my personal experience in numerous investigations that drug dealers routinely use Interstate 91 to bring controlled substances north to Vermont and money south out of Vermont. Further, I know that the area of greater Springfield, Massachusetts (including Holyoke) is known to be a source-city for narcotics, meaning that bulk narcotics are available to purchase in much greater quantities than other areas. Springfield,

5

> Massachusetts is approximately an hour south of Brattleboro via Interstate
> 91.

*Id.* at 11, ¶ 23.

In February 2020, Defendant was stopped for a traffic violation by the
Massachusetts State Police ("MSP") traveling southbound on Interstate 91. Special Agent
Simons spoke with the MSP officer who stopped Defendant, and the MSP officer advised
that during the traffic stop Defendant told the officer that Defendant traveled on Interstate
91 often. The make, model, and registered owner of the vehicle that Defendant was
stopped in was apparently not identified by the MSP officer. In his affidavit, Special
Agent Simons averred that law enforcement's investigation revealed that Defendant's
residence and immediate family are located in Georgia and because Defendant does not
have a "readily apparent legitimate source of income[,]" he opined that "it is unlikely that
[Defendant's] frequent travel on Interstate 91 is related to employment or family
obligations." *Id.* at 12 n.2.

On March 19, 2020, while conducting surveillance in the Brattleboro area,
Detective Reilly observed the 2019 Chevrolet Impala in Vermont and believed it
remained there.

On March 20, 2020, Special Agent Simons applied for a search warrant to place a
GPS tracking device on the 2019 Chevrolet Impala for a forty-five day period to identify,
among other things, potential criminal associates; the identification of physical locations
at which illegal drugs are offloaded, stored, and/or distributed; and the identification of
locations where drug proceeds are stored, deposited, or concealed.

Special Agent Simons testified that when he applied for the tracking warrant, he
knew that the 2019 Chevrolet Impala was a rental car, but did not know to whom it was
rented. In his affidavit, he averred that he is:

> familiar with the manner in which narcotics traffickers use personal and
> rented cars and trucks[] . . . and a variety of other motor vehicles to:
> (a) meet with co-conspirators, customers, and suppliers; (b) transport,
> distribute, and purchase narcotics; (c) transport funds used to purchase
> narcotics; and (d) transport the proceeds of narcotics transactions.

*Id.* at 5, ¶ 5. He further noted that:

6

[B]ased upon my training and experience, tracking drug traffickers in motor vehicles frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions, and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

. . .

Based on my training and experience, tracking narcotics traffickers in motor vehicles often corroborates and verifies other information and investigative leads derived from other investigative techniques including informants, wiretaps, and visual surveillance.

*Id.* at 6, ¶¶ 7-8.

Special Agent Simons's tracking warrant affidavit stated that the 2019 Chevrolet Impala was "registered to The Hertz Corporation, Hertz Vehicles[]" with an address in Florida and was "believed to be operated exclusively by Leroy Brown." *Id.* at 4, ¶ 2 (capitalization omitted).

On March 24, 2020, Magistrate Judge John M. Conroy authorized the installation of the GPS tracking device on the 2019 Chevrolet Impala for a period of forty-five days.

## B. Evidence in Support of Probable Cause for the Econo Lodge Search Warrant.

The affidavit in support of probable cause for the Econo Lodge search warrant was identical in all respects to the tracking warrant except that the Econo Lodge search warrant includes the following additional information.

In his affidavit, Special Agent Simons averred:

I submit there is probable cause to believe that [Defendant] and Deborah McAllister, are involved in the knowing and intentional distribution of cocaine base, . . . and conspiring together with others known and unknown to distribute cocaine base[.] I also submit that there is probable cause to believe that Deborah McAllister unlawfully and knowingly managed and controlled the Econo Lodge, . . . as agent and employee, and made available the premises . . . for the purpose of unlawfully storing and distributing

7

cocaine base[.] In addition, I believe there is probable cause to believe that
evidence of these crimes will be found at [the Econo Lodge front desk and
office areas] and [in Room 203], and that this property is being used in
furtherance of committing these crimes.

(Doc. 77-2 at 10-11, ¶ 4) (capitalization omitted). The Econo Lodge search warrant
affidavit sought authorization to search room 203 of the Econo Lodge, 515 Canal Street,
Brattleboro, Vermont for "evidence relating to conspiracy to distribute and distribution of
cocaine base[.]" *Id.* at 10, ¶ 2.

The affidavit states that the CI conducted "ten controlled purchases of cocaine
base from [Defendant] at the direction of law enforcement at different rooms of [the
Econo Lodge], specifically Rooms 124, 115, and 203"[3] and that since January 13, 2020,
the CI had conducted six controlled purchases of cocaine base in room 203 including the
most recent purchase taking place on March 13, 2020. *Id.* at 12, ¶ 9. The Econo Lodge
search warrant affidavit further stated:

In a later conversation with the CI, CI relayed additional information to
Det. Reilly regarding observations while inside [room 203]. CI stated to
Det. Reilly that CI observed a large amount of personal property inside the
room which he believed to be [Defendant's] property, which was consistent
with someone making the room more of a long-term residence than
temporary lodging.

*Id.* at 16, ¶ 19.

The Econo Lodge search warrant affidavit includes data from the tracking warrant
which reveals the 2019 Chevrolet Impala traveling to two residential locations in the
Brattleboro area and remaining parked for approximately ten to fifteen minutes at those
locations and states that the 2019 Chevrolet Impala was "regularly" at the Econo Lodge
including during overnight hours, and most recently, on March 24, 2020. *Id.* at 17, ¶ 20.

---

[3] The first two controlled purchases had recordings during the CI's travel to and from the Econo
Lodge but no recordings while inside the building. The remaining controlled purchases utilized
covert recording devices and the recordings were generally consistent with the CI's post-buy
interviews in which the CI stated that he had purchased cocaine base from Defendant. "All
controlled purchases involved law enforcement surveillance to the extent practicable, and the CI
was not observed engaging in suspicious conduct during the controlled purchases." (Doc. 77-2 at
12 n.1.)

During the investigation of Defendant, the CI reported to Detective Reilly that Deborah McAllister was a close associate of Defendant. The CI described Ms. McAllister, the front desk clerk of the Econo Lodge, as a cocaine base user. The CI stated that in the past Ms. McAllister assisted the CI in locating Defendant on several occasions while she was on shift and working at the front desk of the Econo Lodge. The CI also reported to Detective Reilly that the CI had seen Ms. McAllister conducting "hand-to-hand transactions in the front desk/lobby area of the Econo Lodge." *Id.* at 17, ¶ 21.

The CI identified Dhruva Patel as a manager/owner of the Econo Lodge. Detective Reilly showed the CI a known photograph of Mr. Patel without identifying information. The CI identified the person in the photograph as Mr. Patel and as an associate of Defendant. The CI advised that Mr. Patel was present during "hand-to-hand cocaine base transactions conducted by [Defendant]." (Doc. 77-2 at 17, ¶ 22.) The CI further stated that he believed that Mr. Patel and Ms. McAllister were "fully aware" of Defendant's illicit drug activity at the Econo Lodge. *Id.*

On "multiple occasions," the CI told Detective Reilly of instances where Ms. McAllister either provided surveillance on Defendant's room for Defendant, or relayed information to Defendant related to Defendant's narcotics distribution business. *Id.* at 17-18, ¶ 23. In December 2019, during an attempted controlled purchase from Defendant, the CI went to the room where he believed Defendant would be, room 124. The CI knocked on the door and received no answer. As the CI was walking away and back towards the predetermined meeting location, the CI advised he received a phone call from Defendant. Defendant told the CI that he was not in his room and was at another location in Brattleboro. The CI later told Detective Reilly that he believed Ms. McAllister likely relayed to Defendant that the CI was outside of Defendant's room, prompting the call from Defendant.

During another controlled purchase, the CI went to room 203 where he believed Defendant was. The CI knocked on the door and received no answer. The CI began walking back to the predetermined meeting location and "made contact with [Ms.] McAllister." *Id.* at 18, ¶ 24 (capitalization omitted). During the CI's encounter with Ms.

9

McAllister, the CI asked where Defendant was and Ms. McAllister advised that Defendant was in his room. Ms. McAllister also contacted Defendant via telephone while the CI was present. Ms. McAllister once again told the CI that Defendant was in his room, and told the CI that Defendant was sleeping. When the CI returned to room 203, Defendant was present and provided the CI with cocaine base. Defendant also stated that he was asleep and had just woken up.

The Econo Lodge search warrant affidavit further details information, including a controlled purchase from Ms. McAllister, which does not mention Defendant other than noting that on January 22, 2020, the CI was attempting to locate Defendant at the Econo Lodge.

Special Agent Simons averred that based on his training and experience, drug traffickers use their residences, among other things, to store "contraband, proceeds of drug sales, and records of transactions in secure locations" in order to "conceal them from law enforcement authorities[.]" *Id.* at 23, ¶ 37(e).

## II.   Conclusions of Law and Analysis.

### A.   Whether to Dismiss the Indictment Based on a Speedy Trial Act Violation.

On March 30, 2021, a criminal complaint was filed against Defendant alleging two controlled substance offenses. Defendant was arrested on March 31, 2020, and had his initial appearance the same day. Defendant was indicted on May 21, 2020.

Prior to Defendant's arrest, the District of Vermont issued General Order 85 in response to the COVID-19 pandemic. General Order 85 postponed all "grand jury proceedings in this District [] until April 23, 2020." Gen. Ord. 85, Dist. Vt., at ¶ 3 (issued Mar. 16, 2020). General Order 85 also declared that "the time period of postponements implemented by this administrative order will be excluded under the Speedy Trial Act, . . . pursuant to 18 U.S.C. § 3161(h)(7)(A)." *Id.* at ¶ 4. The Order declared that the "30-day period for indictment pursuant to 18 U.S.C. § 3161(b) is also subject to this exclusion." *Id.*

On March 23, 2020, the court issued General Order 86 which "supersede[d]"

10

General Order 85 and continued postponement of grand jury proceedings until April 23, 2020. Gen. Ord. 86, Dist. Vt., at ¶ 9 (issued Mar. 23, 2020). It also excluded time under the Speedy Trial Act under 18 U.S.C. § 3161(h)(7)(A). General Order 86 stated that the court would "vacate, extend or amend this order no later than April 23, 2020[,]" *id.* at 4, however, the court did not address General Order 86 or the Speedy Trial Act until April 28, 2020 in General Order 89. General Order 89 declared that all "grand jury proceedings in this District remain postponed until May 21, 2020." Gen. Ord. 89, Dist. Vt., at ¶ 8 (issued Apr. 28, 2020). General Order 89 also excluded time under the Speedy Trial Act but did not address the time between April 23, 2020 and April 28, 2020.

Defendant argues that the Indictment should be dismissed with prejudice because the government failed to comply with the Speedy Trial Act as it did not indict him within thirty days of his arrest as required by 18 U.S.C. § 3161(b). The government counters that because the grand jury was empaneled but was not "in session" no violation occurred.

Section 3161(b) provides:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges. If an individual has been charged with a felony in a district in which no grand jury has been *in session* during such thirty-day period, the period of time for filing of the indictment shall be extended an additional thirty days.

*Id.* (emphasis supplied). "The plain language of section 3161(b) is unambiguous: where a grand-jury is not in session during the thirty-day period, the period of time for filing of the indictment shall be extended an additional thirty days. . . . [T]he extension of time is automatic; no Government motion is required." *United States v. Mann*, 701 F.3d 274, 284-85 (8th Cir. 2012) (internal quotation marks and citation omitted). If the government fails to indict a defendant within the time limit required by § 3161(b), as extended by § 3161(h), "such charge against that individual contained in such complaint shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1).

In the context of a criminal statute of limitations, the Supreme Court found that whether the grand jury was "in session" was based on the "grand jury schedule." *Jaben v.*

*United States*, 381 U.S. 214, 219-20 (1965). Relying on *Jaben*, the Ninth Circuit observed:

> The district court's opinion erroneously suggests that as long as a grand jury is empanel[ed], and regardless of its schedule, it is "in session" within the meaning of *Jaben*. A close reading of *Jaben* convinces us that the Court meant to equate "session" with the current "grand jury schedule", not with the theoretical possibility of summoning a grand jury on short notice. Justice Goldberg's separate opinion also indicates that the words "session" and "schedule" refer to the time when a grand jury is actually "sitting."

*United States v. Towill*, 548 F.2d 1363, 1367 (9th Cir. 1977).

Whether a grand jury is "in session" under 18 U.S.C. § 3161 has not been addressed by the Supreme Court or a federal Circuit Court of Appeals, however, several district courts in ruling on COVID-19-related extensions have held that a grand jury is "in session" when it is scheduled to meet. *See, e.g.*, *United States v. Lopez*, 2020 WL 1433158, at *1 n.1 (E.D. Cal. Mar. 24, 2020) (holding that "[t]he Supreme Court has referred to a grand jury being 'not in session' to refer to the grand jury's 'schedule,' not its empanelment") (quoting *Jaben*, 381 U.S. at 219); *United States v. Garcia-Estrada*, 2020 WL 2100677, at *1 n.1 (D. Idaho May 1, 2020) (same); *United States v. Huerta-Zuniga*, 2020 WL 2046374, at *1 n.1 (D. Idaho Apr. 28, 2020) (same).[4] These cases rely on Fed. R. Crim. P. 6(d)(1) which states:

> (d) Who May Be Present.

> (1) *While the Grand Jury Is in Session.* The following persons may be present while the grand jury is in session: attorneys for the government, the witness being questioned, interpreters when needed, and a court reporter or an operator of a recording device.

Accordingly, under Rule 6, a grand jury is "in session" only when it is scheduled to meet

---

[4] *See also United States v. Castillo*, 2020 WL 1457915, at *1 (M.D. Tenn. Mar. 25, 2020) (noting that "all Grand Jury proceedings scheduled to take place between March 17, 2020 and April 30, 2020, are continued. Accordingly, all related deadlines are suspended and tolled for all purposes, including the statute of limitations from March 17, 2020 through April 30, 2020. Admin. Order 209 at ¶ 6. Those grand juries are not in session but remain empaneled.") (internal quotation marks omitted); *United States v. Santacruz-Cortes*, 2020 WL 3884509, at *2 (D. Ariz. July 9, 2020) (finding that "[t]he last day and time that a grand jury was in session in the District of Arizona was March 11, 2020 at 3:19 p.m.").

so that evidence may be presented. Because the proper definition of "in session" is when the grand jury is both empaneled and scheduled to meet and because no grand jury was scheduled to meet from March 31, 2020 until May 21, 2020, the government did not violate 18 U.S.C. § 3161(b) by indicting Defendant more than thirty days after his arrest. Defendant was ultimately indicted on the fiftieth day after his arrest, well within the extended thirty-day time period allowed under 18 U.S.C. § 3161(b).

For the foregoing reasons, Defendant's motion to dismiss the Indictment based on a Speedy Trial Act violation (Doc. 87) is DENIED.

### B.    Whether the Tracking Warrant was Supported by Probable Cause.

Defendant argues the tracking warrant's conclusion that Defendant was the exclusive operator of the 2019 Chevrolet Impala is speculation supported by a single observation of Defendant operating that rental vehicle without any indication of who rented it. The government responds that the tracking warrant affidavit established a clear connection between Defendant and the 2019 Chevrolet Impala, as well as between the 2019 Chevrolet Impala and controlled substance distributions in the Brattleboro area. It further argues that even if the warrant was not supported by probable cause, the good faith exception under *United States v. Leon*, 468 U.S. 897 (1984) applies.

The Fourth Amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

The Supreme Court has characterized probable cause as "a fluid concept" that is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The probable cause inquiry "turns on an 'assessment of probabilities' and inferences, not on proof of specific criminal conduct beyond a reasonable doubt or even by a preponderance of the evidence." *United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005) (quoting *Gates*, 462 U.S. at 235). "The probable-cause

standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Because the standard is "subjective[,]" courts "generally accord[] 'substantial deference to the finding of an issuing judicial officer that probable cause exists,' limiting [their] inquiry to whether the officer 'had a substantial basis' for [her] determination." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (quoting *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)).

Although Defendant was only observed driving the 2019 Chevrolet Impala on one occasion, he was seen doing so immediately following a controlled purchase with the CI who referred to the 2019 Chevrolet Impala as Defendant's vehicle. On the occasion in question, Defendant drove the 2019 Chevrolet Impala out of the Price Chopper parking lot as the CI was walking toward law enforcement after the controlled purchase in Defendant's hotel room. In arguing this evidence is insufficient for probable cause, Defendant relies on *United States v. Lopez-Zuniga*, 909 F.3d 906 (8th Cir. 2018) in which the Eighth Circuit found the good faith exception inapplicable where a GPS tracking warrant for the defendant's car was supported solely by two instances of a known drug trafficker riding as a passenger in the defendant's car.[5] In contrast, Defendant was not a mere passenger of the 2019 Chevrolet Impala and the tracking warrant did not depend on

---

[5] Defendant also cites *United States v. Schermerhorn*, 71 F. Supp. 3d 948, 956 (E.D. Mo. 2014), for the proposition that a single documented use of a vehicle in connection with suspected drug activity is insufficient for probable cause to issue a GPS tracking warrant. The GPS tracking warrant in that case was issued based on "the fact a *known drug dealer* travelled with a driver in a specific car on one occasion to a *known drug supplier's residence*[.]" *Id.* (emphasis in original). The court held that such evidence:

> may establish a fair probability that the car will be used to make future trips to facilitate drug trafficking activities. Those facts alone, however, are not sufficient to establish probable cause to attach a GPS device to the car used on that single occasion. More information must be provided about the car (its owner, or the known driver of the car) to establish a relationship between either, the *known drug dealer* and the *driver of the specific car,* or the *known drug dealer* and *the specific car.*

*Id.* (emphasis in original). Again, Defendant was the operator, not the passenger of the 2019 Chevrolet Impala which was seen engaging in trips consistent with drug trafficking activity.

Defendant's status as its renter but instead depended on use of the 2019 Chevrolet Impala in connection with a controlled purchase and its apparent further use in travel for suspected drug trafficking purposes "on multiple occasions" in March of 2020. (Doc. 77-1 at 11, ¶ 22.)

The CI not only described the 2019 Chevrolet Impala as Defendant's vehicle, he reported that he saw Ms. Burgess, a known associate of Defendant's, standing next to it in the Econo Lodge parking lot shortly before the controlled purchase. *See id.* at 9, ¶ 19 ("[Ms.] Burgess was standing next to [Defendant's] vehicle, a 2019 Chevrolet Impala with Florida registration[.]").

Defendant asserts that although the tracking warrant affidavit indicates that the 2019 Chevrolet Impala was a rental car, information about the renter of the car was improperly omitted from the search warrant affidavit. However, Special Agent Simons credibly testified that when he submitted his affidavit, he did not know to whom the 2019 Chevrolet Impala was rented. *See United States v. Soto*, 52 F. App'x 534, 535 (2d Cir. 2002) ("This Court has held that in order to suppress evidence obtained through the use of an allegedly insufficient search warrant, a defendant must prove that: '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.'") (alteration in original) (quoting *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000)).

During March 2020, the 2019 Chevrolet Impala traveled across the Vermont-Massachusetts border using Interstate 91, a known drug corridor,[6] and, on several

---

[6] The use of a known drug corridor does not alone provide probable cause. *See Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir. 2016) (holding that because the defendant "was driving on I-70[, a 'known drug corridor,'] does not make his otherwise innocent conduct suspicious"); *United States v. Glenn*, 204 F. Supp. 3d 893, 906 (M.D. La. 2016), *aff'd sub nom. United States v. Walker*, 706 F. App'x 152 (5th Cir. 2017), and *aff'd sub nom. United States v. James*, 770 F. App'x 700 (5th Cir. 2019), and *aff'd*, 931 F.3d 424 (5th Cir. 2019) (concluding that the following evidence provided a basis for reasonable suspicion but not probable cause: "a screwdriver in the door console, a rental car with a tinted license plate cover, and traveling on a

occasions, made two trips within twenty-four hours. Defendant was also stopped on Interstate 91 for a traffic violation and he revealed that he drove on Interstate 91 frequently. Upon investigation, law enforcement could find no familial or employment reason for his doing so. The 2019 Chevrolet Impala was last observed in Brattleboro, Vermont the day before Special Agent Simons applied for the tracking warrant.

"[I]it is generally understood that probable cause to search is demonstrated where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)). Based on the totality of the circumstances, the nexus between Defendant and the 2019 Chevrolet Impala was sufficient for probable cause for the tracking warrant because it supported a conclusion that he had recently used the rented vehicle for drug trafficking activities. *See United States v. Nova*, 478 F. Supp. 3d 87, 92 (D. Mass. 2020) (finding probable cause for a GPS tracking warrant of two rental vehicles where a "CI[] informed law enforcement that [the defendant] used rental vehicles to conduct drug transactions" and the defendant arrived at controlled buys in each of the rental vehicles described); *United States v. Bailey*, 2016 WL 6995067, at *32 (W.D.N.Y. Nov. 29, 2016) (concluding that there was probable cause to issue a GPS tracking warrant because the supporting affidavit "summarized the results of the investigation to date and summarized the contents of several communications between [the defendant and two alleged co-conspirators,] and the cocaine source that, when coupled with surveillance observations, strongly suggested that the [vehicle] was used to further their drug trafficking activities").

Whether Defendant was the 2019 Chevrolet Impala's renter or its owner is not material where there was evidence to support a conclusion that it was "[his] vehicle," Doc. 77-1 at 9, ¶ 19, and where the affidavit averred it was operated "exclusively by [him]." *Id.* at 4, ¶ 2. Based on that evidence as well as Defendant's use of the vehicle in

---

drug corridor"). However, multiple trips with no apparent purpose other than drug trafficking may be probative.

suspected drug trafficking activities, there was a fair probability that evidence of the crimes under investigation and the individuals committing those offenses would be discovered by monitoring the 2019 Chevrolet Impala's location.

Because the tracking warrant was supported by probable cause, Defendant's motion to suppress evidence obtained from its execution (Doc. 73) is DENIED.

## C.      Whether the Econo Lodge Search Warrant was Supported by Probable Cause.

Defendant asserts that information provided in the Econo Lodge search warrant affidavit was stale and defeats a finding of probable cause. He points out that he is alleged to have sold drugs from three different Econo Lodge rooms during a three-month period and the last controlled purchase included in Special Agent Simons's affidavit occurred on March 13, 2020, eleven days before the Econo Lodge search warrant was issued.[7]

A court may "conclude that a warrant lacks probable cause where the evidence supporting it is not 'sufficiently close in time to the issuance of the warrant' that 'probable cause can be said to exist *as of the time of the search*[,]'" in other words, "where the facts supporting criminal activity have grown stale by the time that the warrant issues." *Raymonda*, 780 F.3d at 114 (quoting *Wagner*, 989 F.2d at 72) (emphasis in original). The law recognizes "no bright-line rule for staleness[,]" *Walczyk*, 496 F.3d at 162, however, "the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted" so that probable cause continues to exist. *Wagner*, 989 F.2d at 75.

The two critical factors in determining staleness are the age of the facts alleged and the "nature of the conduct alleged to have violated the law." *United States v. Ortiz*, 143 F.3d 728, 732 (2d Cir. 1998) (internal quotation marks omitted). The Second Circuit

---

[7] Defendant also contends that the Econo Lodge search warrant affidavit omits that "another sale took place away from the hotel." (Doc. 74 at 5.) Defendant did not present evidence of this alleged sale during the hearing, and it does not, in any event, undermine probable cause for a search of room 203 but, at best, suggests that Defendant's alleged drug trafficking may have also taken place in other locations.

has held where "facts show[] an ongoing operation and a continuing pattern of conduct[,]" evidence does not "turn stale" after a three week period. *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981) (holding the warrant "quite adequately established that probable cause existed for the issuance of the warrant on May 28, despite the fact that the latest event described occurred on May 6" based on the pattern of ongoing conduct).

During the approximately three-month period that preceded the issuance of the Econo Lodge search warrant, Defendant is alleged to have sold cocaine base to the CI ten times from Econo Lodge rooms 124, 115, and 203. From mid-January until March 13, 2020, Defendant is alleged to have sold cocaine base from room 203 to the CI six times. The most recent controlled purchase on March 13, 2020, took place in room 203, eleven days before the Econo Lodge search warrant was issued. After that controlled purchase, the CI reported to Detective Reilly that he observed a large quantity of personal items in room 203 which he believed belonged to Defendant and which were consistent with Defendant residing there. Evidence obtained from the tracking warrant indicated that the 2019 Chevrolet Impala was at the Econo Lodge frequently, including during overnight hours, and was most recently at the Econo Lodge on March 24, 2020, the same day Special Agent Simons applied for the search warrant for room 203. In addition, the affidavit detailed at some length the connection between Defendant and his alleged co-conspirator, Ms. McAllister, and the use of the Econo Lodge as the base of their alleged drug trafficking operations.

Because the Econo Lodge search warrant affidavit detailed an ongoing pattern of drug sales by Defendant from room 203 over a three-month period, including a drug sale on March 13, 2020, and because the search warrant was issued less than two weeks thereafter, it was not stale.[8] *See Ortiz*, 143 F.3d at 732-33 (concluding that "in

---

[8] Defendant cites *Sgro v. United States*, 287 U.S. 206 (1932), for the proposition that a search warrant was stale because it was issued twenty-one days after the defendant made an illegal sale of alcohol. *Sgro* is inapposite because the government allowed the time allotted for execution of the search warrant to expire and thereafter the court reissued the search warrant. The Supreme Court held that "it is manifest that the proof must be of facts so closely related to the time of the

investigations of ongoing narcotics operations, 'intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale'") (quoting *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)); *United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991) ("As we have previously held, information that is two weeks old is not necessarily stale, especially when it concerns a possible ongoing narcotics trafficking operation.").

Because the evidence set forth in the Econo Lodge affidavit indicated Defendant's presence in room 203 was not transitory but was, instead, his last known residence where he kept a large amount of his personal property, there was a sufficient basis to believe that evidence of the crime under investigation would be found there. The fact that Defendant may have previously used other hotel rooms does not alter that conclusion.

Where, as here, a neutral magistrate judge reviewed the evidence and determined that probable cause existed, that determination is entitled to "great deference." *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Gates*, 462 U.S. at 236). The evidence in support of the Econo Lodge warrant was not stale and established probable cause. Defendant's motion to suppress evidence obtained during the execution of the Econo Lodge search warrant (Doc. 74) is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for a Speedy Trial Act violation as well as Defendant's motions to suppress evidence obtained during execution

---

issue of the warrant as to justify a finding of probable cause at that time[]" and that "[w]hether the proof meets this test must be determined by the circumstances of each case." *Id.* at 210-11. In *Sgro*, the search warrant was issued pursuant to the National Prohibition Act which stated that "[a] search warrant must be executed and returned to the judge or commissioner who issued it within ten days after its date; after the expiration of this time the warrant, unless executed, is void." *Id.* at 210. The Supreme Court concluded that "we must read the provision which in explicit terms makes a warrant void unless executed within ten days after its date. That period marks the permitted duration of the proceeding in which the warrant is issued[]" and "[t]here is no provision which authorizes the commissioner to extend its life or to revive it." *Id.* at 211. The Supreme Court did not conclude that the warrant was stale but rather held that the statute prohibited its extension beyond ten days.

19

of the tracking warrant and from execution of the Econo Lodge search warrant are

DENIED. (Doc. 87, 73, & 74.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 8th day of June, 2021.

Christina Reiss, District Judge
United States District Court